UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHELLE PIKE,

                    Plaintiff,

        v.                                          **DECISION AND ORDER**
                                                    **05-CV-1249 (VEB)**
JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.


# Introduction

1.      Plaintiff Michelle Pike challenges an Administrative Law Judge's

("ALJ") determination that she is not entitled to supplemental security income

benefits ("SSI"), or disability insurance benefits ("DIB"), under the Social

Security Act ("the Act").  Plaintiff alleges she has been disabled since January

25, 2001, because of depression, anxiety, migraine headaches, a broken left

shoulder, memory problems, and hernia surgery.  Plaintiff has met the

disability insured status requirements of the Act at all times pertinent to this

claim.

# Procedural History

2.      Plaintiff filed an application for SSI and DIB on December 16, 2002,

alleging an onset of disability of January 25, 2001.  Her application was

denied initially and, under the prototype model of handling claims without

requiring a reconsideration step, Plaintiff was permitted to appeal directly to

the ALJ.  See 65 Fed. Reg. 81553 (Dec. 26, 2000).  Plaintiff filed a timely

request for a hearing before an ALJ, and on March 23, 2004, Plaintiff,

accompanied by her attorney, appeared and testified before ALJ Charles R. Boyer.  The ALJ considered the case *de novo* and on August 16, 2004, issued a partially favorable decision finding that Plaintiff became disabled on October 14, 2004, but was not disabled within the meaning of the Act prior to that date. Plaintiff submitted additional evidence after the date of the ALJ's decision and requested the Appeals Council review the decision. On August 5, 2005, the Appeals Council denied Plaintiff's request for review.

3.      On October 3, 2005, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court review the decision of the ALJ pursuant to Section 205(g) and 1631(c) (3) of the Act, modify the decision of Defendant, and grant SSI or DIB benefits to Plaintiff for the period claimed prior to October 14, 2004.[1]  The Defendant filed an answer to Plaintiff's complaint on February 2, 2006, requesting the Court to dismiss Plaintiff's complaint.  Plaintiff submitted Plaintiff's Brief requesting that the Commissioner reverse and remand the ALJ's decision on March 20, 2006. On October 30, 2007, Defendant filed a Memorandum of Law in Support of Her Motion for Judgment on the Pleadings[2] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full briefing, the Court deemed oral argument unnecessary and took the motions under advisement.

## Discussion

---

[1] The ALJ's August 16, 2004, decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.
[2] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

**Legal Standard and Scope of Review:**

4.      A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  <u>See</u> 42 U.S.C. § 405(g), 1383 (c)(3); <u>Wagner v. Sec'y of Health and Human Servs.</u>, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if it is not supported by substantial evidence or there has been a legal error. <u>See</u>  <u>Grey v. Heckler</u>, 721 F.2d 41, 46 (2d Cir. 1983); <u>Marcus v. Califano</u>, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  <u>See</u> <u>Rutherford v. Schweiker</u>, 685 F.2d 60, 62 (2d Cir. 1982).

5.      "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." <u>Williams on Behalf of Williams v. Bowen</u>, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  <u>Rosado v. Sullivan</u>, 805 F. Supp. 147, 153 (S.D.N.Y.

1992).  In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review."  Valente v. Sec'y of Health and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

6.     The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act.  See 20 C.F.R. § 404.1520, 416.920.  The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled.

7.     This five-step process is detailed below:

First, the [Commissioner] considers whether the claimant is currently engaged substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work active- ties.  If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled with- out considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gain- ful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also

Rosa v. Callahan, 168 F.3d 72,77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

8.      While the claimant has the burden of proof as to the first four steps,

the Commissioner has the burden of proof on the fifth and final step.  See

Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984).

The final step of this inquiry is, in turn, divided into two parts.  First, the

Commissioner must assess the claimant's job qualifications by considering

his physical ability, age, education, and work experience.  Second, the

Commissioner must determine whether jobs exist in the national economy

that a person having the claimant's qualifications could perform.  See 42

U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461

U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

9.      In this case, the ALJ made the following findings with regard to

factual information as well as the five-step process set forth above: (1)

Plaintiff met the nondisability requirements for a period of disability and

Disability Insurance Benefits set forth in Section 216(i) of the Social Security

Act and is insured for benefits through the date of this decision (R. at 27);[3]

(2) Plaintiff has not engaged in substantial gainful activity since the alleged

onset of disability (R. at 27); (3) Plaintiff has a severe mental impairment

(affective disorder, personality disorder and addiction disorder) (R. at 27); (4)

Since October 14, 2003, Plaintiff's affective disorder has satisfied the

requirements of section 12.04 of Appendix 1, Subpart P, Regulation No. 4.

Prior to October 14, 2003, the Plaintiff abused drugs and alcohol so heavily

_____

[3] Citations to the underlying administrative are designated as "R."

that she could not maintain employment, but if she had abstained from drugs and alcohol, she would not have had an impairment that satisfied the requirements of any section of Appendix 1, Subpart P of Regulations No. 4 (R. at 27); (5) Plaintiff's allegations are not totally credible for the reasons set forth in the body of the decision (R. at 27); (6) All of the medical opinions in the record have been considered in assessing the severity of the Plaintiff's impairments and limitations (20 C.F.R. §§ 404.1563 and 416.963) (R. at 27); (7) Prior to October 14, 2003, if Plaintiff had abstained from drugs and alcohol, she would have had the residual functional capacity for work that involved simple repetitive tasks (R. at 27); (8) Plaintiff is 43 years old (20 C.F.R. §§ 404.1563 and 416.963) (R. at 27); (9) Plaintiff has a high school education (20 C.F.R §§ 404.1564 and 416.964) (R. at 27); (10) Transferability of work skills is not a determinative factor in this case (20 C.F.R. §§ 404.1568 and 416.968) (R. at 27); (11) Prior to October 14, 2003, if Plaintiff had abstained from drugs and alcohol, she would have had the residual functional capacity to perform a significant range of work at all levels of exertion (20 C.F.R. §§ 404.1567 and 416.967) (R. at 27); and (12) Prior to October 14, 2003, Plaintiff was not under a "disability," as defined in the Social Security Act (20 C.F.R. §§ 404.1520(f) and 416.920(f)) (R. at 27).  Ultimately, the ALJ determined Plaintiff was entitled to a period of disability, and disability insurance benefits, based on a disability that began October 14, 2003 (R. at 28).  Because of Plaintiff's history of drug and alcohol addiction, the ALJ recommended Plaintiff's benefit payments be made through a representative

payee.  Id.  The ALJ further noted that Plaintiff's condition would likely improve with treatment, and a review of Plaintiff's disability should be performed annually.  Id.

**Plaintiff's Allegation:**

10.     Plaintiff's alleges that the Appeals Council failed to review the ALJ's decision even after she submitted what she considers to be new and relevant evidence specific and material to the time period of her claim. Plaintiff claims this new and relevant establishes her onset of disability date as January 25, 2001, rather than October 14, 2003, as determined by the ALJ.  The regulations provide that the Appeals Council will consider new and material evidence only when it relates to the period on or before the date of the ALJ's decision.  See 20 C.F.R. §§ 404.970(b) and 416.1470(b); see also Accord Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996).

Prior to addressing Plaintiff's challenge, the Court will present a summary of her medical history, as an awareness of this history is essential to understanding the decision of the Court.

**Plaintiff's Medical History During to the Time Frame for Her Claim:**

11.     On August 14, 2000, Plaintiff was examined by a consulting physician, Dr. William Gooch, when she complained of parathesias and spontaneous movement of her left thumb (R. at 115-116).  After a thorough examination, Dr. Gooch opined Plaintiff's symptoms might be caused by carpal tunnel syndrome of her left wrist (R. at 116).  The doctor recommended Plaintiff undergo an EMG and nerve conduction study.  Id.  The EMG and

nerve conduction study was completed on September 21, 2000, and revealed normal results, with no evidence of carpal tunnel syndrome (R. at 117-118).

Plaintiff went to the emergency room of the Kingston Hospital on November 8, 2001, complaining of pain in her left shoulder (R. at 121-122). Plaintiff reported she had been in an altercation with another woman, and the other woman had pulled her arm (R. at 121).  Plaintiff was diagnosed with a contusion of the left shoulder, instructed to use Motrin for pain, and was discharged from the emergency room the same day (R. at 122).

On November 9, 2001, the Kingston Hospital emergency room physician was notified by the consulting radiologist that Plaintiff had suffered a grade IV acromioclavicular separation with no evidence of fracture (R. at 123)[4].  Plaintiff returned to the emergency room on November 12, 2001, complaining of pain in her left shoulder and an inability to raise her left arm (R. at 127).  She told the nurse practitioner she was homeless and living out of a van.  Id.  Plaintiff was advised to treat her left shoulder with alternating ice and hot packs, and for follow-up care, was given the names and telephone numbers of two physicians who would treat Medicaid patients (R. at 128).

Plaintiff underwent a gynecological examination on January 24, 2003, at Catskill Women's Health Center (R. at 132-133).  The name of the examining physician does not appear in the record.  Id.  Plaintiff reported mood swings and irritability (R. at 132).  The examining physician opined

---

[4] An acromioclavicular (AC) joint separation is the formal name for a separation of the collar bone from the shoulder blade.  See http://www.csmc.edu./12889.html.

Plaintiff was in perimenopause (R. at 133).  All laboratory tests from the examination were normal (R. at 134-135).

Also on January 24, 2003, Plaintiff's treating physician, Dr. Robert Schneider, obtained a sample of Plaintiff's blood for testing (R. at 130-131). The results of the blood tests were unremarkable.  Id.

Plaintiff underwent surgery to repair a hernia in her lower left quadrant on January 29, 2003 (R. at 136-137).  Plaintiff's surgeon, Dr. Barbara Brazis, reported no complications during or after the surgery.  Id.

On February 4, 2003, Dr. Schneider completed a Disability Determination Form for the New York State Office of Temporary and Disability Determinations (R. at 138-149).  He recorded Plaintiff was limping because of her hernia repair surgery one week earlier, and noted her presenting problems were depression and anxiety (R. at 141-142).  Based on his most recent examination of Plaintiff, Dr. Schneider observed Plaintiff had a flat affect, with slow speech and depressed mood and affect (R. at 143).  He assessed Plaintiff's attention and concentration as poor, and her memory as fair, but rated her orientation, fund of information, ability to perform calculations and serial sevens, and insight and judgment as good.  Id.  The doctor opined Plaintiff was limited in her ability to perform work-related functions, and noted Plaintiff "is *subjectively* unable to participate in ADLs and working functions"[5] (R. at 147-148).

On February 7, 2003, Plaintiff was given a psychological examination by Carol A. Levett, Ph.D. (R. at 166-167).  Dr. Levett recorded

---

[5] Italics added.

Plaintiff's presenting problems as depression, substance abuse, suicidal ideation, panic attacks, and severe anxiety (R. at 166).  Plaintiff's mental status examination revealed she was depressed, had mood swings, rages, suicidal ideation, and dissociation.  Id.  Dr. Levett diagnosed Plaintiff with post-traumatic stress disorder, borderline personality disorder, and substance abuse, and recommended ten sessions of outpatient counseling.  Id.

Plaintiff was examined by an orthopedic surgeon, Dr. John Czajka, on February 12, 2003 (R. at 150).  Dr. Czajka noted Plaintiff had a "third degree AC separation" of her left shoulder in November 2001.  Id.  Upon examination, the doctor found Plaintiff had an essentially normal arc of motion and function in her left shoulder.  Id.  The doctor opined Plaintiff's shoulder required no further treatment other than stretching and strengthening exercises.  Id.  Plaintiff also complained to Dr. Czajka of a "snapping and popping sensation" in her neck, but a physical examination and x-rays of Plaintiff's neck revealed normal results.  Id.

On February 25, 2003, Plaintiff met with Dr. Levett for a therapy session (R. at 166).  Dr. Levett noted only that Plaintiff was recovering from hernia surgery, was not using drugs, was unsure about her relationship with Ed, and would write about George.  Id.

State agency psychologist Michelle Marks, Ph.D. attempted to complete a Psychiatric Review Technique form for Plaintiff on March 17, 2003 (R. at 152-165).  She recorded that there was insufficient evidence to determine a medical disposition (R. at 152).

On April 16, 2003, Dr. Levett noted in her file that "Michelle and I agreed that if she wants to come back, I will schedule regular times and she must use Medicaid transport.  She is very worried about hepatitis C" (R. at 167).

Plaintiff met with Dr. Levett on May 15, 2003.  Id.  The doctor noted only "Michelle back from Florida, had been drinking, etc.  Waiting for reports on hepatitis C and liver."  Id.

On May 22, 2003, Dr. Levett recorded "Michelle is dealing with potentially fatal disease, all the tests, fear and also being off drugs, not happy with Ed who is 'punitive'".  Id.

Plaintiff was scheduled to meet with Dr. Levett on May 28, 2003, but the doctor reported "M. did not come as she was arrested and put in jail on her way here."  Id.

On September 25, 2003, Plaintiff once again met with Dr. Levett (R. at 168).  The doctor instructed Plaintiff to write a letter to her deceased boyfriend George, but to write the letter as if Plaintiff were the one who died and George was still alive.  Id.

Dr. Levett noted in her file that Plaintiff did not keep her appointment scheduled for October 14, 2003, as Plaintiff had been admitted to the psychiatric unit at Columbia Memorial Hospital (R. at 169).

On October 14, 2003, Plaintiff was admitted to Columbia Memorial Hospital after a suicide attempt on the anniversary of her boyfriend's death (R. at 183-185).  Plaintiff admitted to treating psychiatrist, Dr. Richard Plotkin,

that she really did not intend to kill herself, but was desperate because she lacked money and a car, and was despondent about her lot in life (R. at 183). Dr. Plotkin noted Plaintiff told him she "has applied for disability and was told that she should not work while the decision is pending."  Id.  While in the hospital, Dr. Plotkin observed Plaintiff participated in both individual and group psychotherapy, and was able to set a target goal of total abstinence from drugs and alcohol (R. at 185).  The doctor recommended further rehabilitation at McPike Addiction Treatment Center, and Plaintiff agreed to further treatment at that center.  Id.  Plaintiff was discharged from Columbia Memorial Hospital on October 27, 2003.  Id.  No treatment records from McPike Addiction Treatment Center are contained in the record.

On December 18, 2003, Plaintiff underwent a screening with treating psychiatrist, Dr. Anis Wasfi, at Greene County Mental Health Center (R. at 176).  Dr. Wasfi noted Plaintiff's earlier suicide attempt was "gestural," and diagnosed her with borderline personality disorder, bipolar disorder, post-traumatic stress disorder, and polysubstance dependence.  Id.  Plaintiff was admitted for outpatient treatment at Green County Mental Health Center.  Id.

Plaintiff was evaluated for inguinal hernia surgery by treating surgeon, Dr. Brian Valerian, on January 27, 2004 (R. at 178).  Dr. Valerian recommended Plaintiff undergo open left inguinal hernia repair and scheduled the surgery for February 13, 2004.  Id.

On January 30, 2004, Plaintiff had her initial counseling session at Greene County Mental Health Center with staff social worker Rowena

12

McDade (R. at 177).  Plaintiff was alert, oriented to time, place, and person, and actively engaged in the therapy session.  Id.  Ms. McDade noted Plaintiff's memory was intact and she made fair eye contact.  Id.  Plaintiff requested bereavement counseling.  Id.

On February 2, 2004, Dr. Wasfi interviewed Plaintiff and prepared a Core Psychiatric Function report (R. at 173).  The doctor noted Plaintiff was well-groomed, easily distracted and irritable.  Id.  He observed she had poorly directed thinking, but showed no psychotic symptoms or signs of obsessive-compulsive disorder.  Id.  Dr. Wasfi noted Plaintiff was alert and oriented, and exhibited normal intelligence, with comprehension and memory grossly intact.  Id.  The doctor observed no suicidal or homicidal behavior or ideation.  Id.  Dr. Wasfi recommended Plaintiff be treated with medication and counseling.  Id.

Plaintiff met with social worker Rowena McDade again on February 11, 2004 (R. at 177).  Ms. McDade noted Plaintiff was adequately groomed, alert, oriented, and showed no suicidal or homicidal ideation.  Plaintiff advised Ms. McDade she was "coping okay on current medications."  Id.  Ms. McDade noted Plaintiff's treatment plan consisted of individual counseling therapy three to four times per month, and medication.  Id.

On February 13, 2004, Plaintiff underwent open left inguinal hernia repair surgery (R. at 179-180).  Dr. Valerian noted no complications from the procedure (R. at 180).

Plaintiff underwent an MRI of her right upper extremity on March 2, 2004 (R. at 170).  The examination revealed essentially normal results with no tears noted in the rotator cuff.  Id.

On March 19, 2004, Dr. Levett noted in Plaintiff's file that the doctor had had no further contact with Plaintiff since October 21, 2003, when Plaintiff was transferred from Columbia Memorial Hospital to McPike Addiction Treatment Center (R. at 169).

Dr. Wasfi prepared a Mental Evaluation Report for Plaintiff on March 31, 2004 (R. at 188-194).  The doctor assessed Plaintiff as having improved in her ability to focus and concentrate, but exhibited poor memory (R. at 191).  He noted Plaintiff's ability to take in information was affected by her moods, and that she still displayed poor insight and judgment.  Id.  The doctor observed Plaintiff could perform simple calculations, but was unable to do serial sevens.  Id.  Dr. Wasfi stated Plaintiff's friends helped her with shopping and cooking, but Plaintiff made fabric rugs, decorated with fabric, drew pictures, and wrote poetry, songs, and stories.  Id.  The doctor noted Plaintiff's ability to interact appropriately with co-workers in the workplace was questionable, but that she could function in the workplace with limited supervision.  Id.  The doctor assessed Plaintiff as capable of following simple instructions, but suggested she would difficulty following a work routine and schedule (R. at 192).  Dr. Wasfi noted Plaintiff could be impulsive, but was unlikely to engage in risky behavior in the workplace (R. at 193).  He further assessed Plaintiff as having difficulty responding to workplace changes.  Id.

14

Plaintiff was examined by a State agency psychologist, Dr. Kerry Brand, on May 4, 2004 (R. at 195-201).  Plaintiff reported to Dr. Brand that she was fired from her job as a grocery store cashier January 2001, when she gave away food (R. at 195).  Plaintiff revealed that she knew at the time she would be fired for engaging in this conduct.  Id.  Upon examination, Dr. Brand found Plaintiff to be cooperative, with adequate social skills (R. at 199).  Dr. Brand rated Plaintiff's grooming skills as "good," and noted her gait, posture, and motor behavior were normal.  Id.  Plaintiff's speech was fluent, and expressive and receptive language skills were adequate.  Id.  Dr. Brand noted Plaintiff's thought processes were tangential during the evaluation, and that she jumped from topic to topic.  Id.  He found Plaintiff's affect to be of full range and appropriate of speech and thoughtful content, although Dr. Brand observed Plaintiff's mood to be sad and tearful.  Id.  Plaintiff was oriented to time, place, and person, and her attention and concentration were intact.  Id.  Plaintiff could count, perform simple calculations, and serial 3s.  Id.  Dr. Brand noted Plaintiff recent and remote memory skills were mildly impaired because of emotional distress, depression and anxiety.  Id.  He rated Plaintiff's cognitive functioning in the average to below average range, and found her insight and judgment to be fair (R. at 200).  Plaintiff reported to Dr. Brand that she was independent in most of her activities of daily living, had a girlfriend with whom she spent time, and maintained relationships with her children and ex-husband.  Id.  Plaintiff told Dr. Brand her hobbies included sewing, painting, drawing and reading, and that she planned to do some gardening

and painting for a neighbor.  Id.  Dr. Brand assessed Plaintiff as capable of learning and performing simple work-related tasks, although he believed she would have a problem with learning and performing complex tasks independently because of memory problems.  Id.  He assessed Plaintiff would have some difficulty making appropriate decisions and relating adequately with others, especially when she was depressed.  Id.  Dr. Brand noted the results of his examination were consistent with psychiatric problems that would interfere with Plaintiff's ability to function on a daily basis, although he believed Plaintiff's prognosis to be fair if she continued with her current program of psychological and psychiatric treatment (R. at 201).

Dr. Brand completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on May 4, 2004 (R. at 202-203).  He rated Plaintiff as slightly impaired in her ability to understand and remember detailed instructions, and in her abilities to interact appropriately with the public, work supervisors, and co-workers.  Id.  Dr. Brand rated Plaintiff as moderately impaired in her abilities to carry out detailed instructions, make judgments on simple work-related decisions, and respond appropriately to changes in a routine work setting.  Id.  He assessed Plaintiff as markedly impaired in her ability to respond appropriately to work pressures in a usual work setting (R. at 203).

On June 21, 2004, Dr. Wasfi completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) (R. at 207-208). He rated Plaintiff as moderately impaired in her abilities to carry out short,

simple instructions, make judgments on simple work-related decisions, and interact appropriately with the public.  Id.  Dr. Wasfi assessed Plaintiff as markedly impaired in her abilities to remember short, simple instructions, understand and remember detailed instructions, interact appropriately with supervisors and co-workers, and respond appropriately to changes in a routine work setting.  Id.  He rated Plaintiff as extremely impaired in her abilities to carry out detailed instructions and respond appropriately to work pressures in a usual work setting.  Id.

Dr. Levett completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on October 11, 2004 (R. at 210-211).  Dr. Levett rated Plaintiff as extremely impaired in all areas of work-related mental activities.  Id.  This is the last medical report contained in Plaintiff's record.

**Plaintiff's Challenge:  The Appeals Council Failed to Review the ALJ's Decision After Receipt of Dr. Levett's Medical Source Statement of Ability to Do Work-Related Activities Assessing Plaintiff as "Extremely Impaired" in All Abilities to Do Work-Related Activities**

12.    Plaintiff's challenge to the final decision of the Commissioner alleges that the Appeals Council failed to review the ALJ's decision, to vacate the decision, and to remand the matter for further administrative proceedings based upon what she considers to be new and relevant evidence, both specific and material to the time period of her claim, that establishes her onset of disability date as January 25, 2001.  This evidence consists of a Medical Source Statement of Ability to Do Work-Related Activities (Mental) completed by Dr. Carol Levett on October 11, 2004, approximately twelve and one-half months after Plaintiff's last appointment with Dr. Levett (R. at 210-

211).  The Appeals Council confirmed that it had received this evidence when it denied Plaintiff's request for review of the ALJ's decision on August 5, 2005 (R. at 7-10).

When the Appeals Council receives new evidence with a request to review an ALJ's decision, it will consider all of the evidence in the ALJ's hearing record as well as any new and material evidence submitted to it which relates to the period on or before the date of the ALJ's decision in the matter.  <u>See</u> 20 C.F.R. § 404.976(b).  Guidance given to the Appeals Council for handling evidence submitted after an ALJ's decision is issued in <u>HALLEX, the Hearing, Appeals, and Litigation Manual</u> published on-line by the Social Security Administration's Office of Disability Adjudication and Review.  <u>See</u> http://www.ssa.gov/OP_Home/hallex.html.  In general, "When a claimant or representative submits additional evidence, it must be both new and material to warrant the Appeals Council's consideration.  Evidence is new when it is not duplicative, cumulative or repetitive, and it is material when it affects the ALJ's findings or conclusions <u>and</u> relates to the time [period on or before the date of the ALJ's decision]…When new and material evidence has been submitted with a request for review, the analyst will apply the weight of the evidence rule instead of the substantial evidence rule in deciding whether to recommend review action to the Appeals Council."  <u>See</u> http://www.ssa.gov/OP_Home/hallex/I-03/I-3-3-6.html.  In its fiscal year 2005 Performance and Accountability Report, the Social Security Administration explained its view of the difference between substantial evidence and weight

of evidence by stating, "Substantial evidence is defined as evidence, which, although less than a preponderance, nevertheless is sufficient to convince a reasonable mind of the credibility of a position taken on an issue, when no evidence on the opposing side clearly compels another finding or conclusion. The 'substantial evidence rule' requires less in support of a finding or conclusion than the 'weight of evidence rule.'  Evidence on one side of an issue need not possess greater weight or be more convincing and credible to be 'substantial.'"  <u>See</u> SSA's FY 2005 Performance and Accountability Report, p. 76.

When new evidence is submitted to the Appeals Council with a request to review an ALJ's decision, an Appeals Council analyst must determine if the evidence is: (a) both new and material, (b) new, but not material, or (c) neither new nor material.  The analyst must also consider whether or not the evidence concerns both the issues and the time period considered by the ALJ.  <u>See</u> http://www.ssa.gov/OP_Home/hallex/I-03/I-3-5-20.html.

While the Court has examined Plaintiff's new evidence and recognizes it may be pertinent to the issues considered by the ALJ, it is not material because it does not pertain to the time frame relevant to Plaintiff's claim.  Dr. Levett's Medical Source Statement of Ability to Do Work-Related Activities, presumably prepared at Plaintiff's request, was written more than twelve months after Plaintiff's last appointment with Dr. Levett.  While Dr. Levett states her opinions of Plaintiff's mental abilities, as reflected in the

Medical Source Statement, are based upon Plaintiff's treatment up until September 25, 2003, Dr. Levett's own treatment notes from six therapy sessions with Plaintiff, beginning February 7, 2003 through September 25, 2003, provide no evidence that Dr. Levett viewed Plaintiff as markedly impaired in all work-related mental activities (R. 166-168, 211).  As an example, when Dr. Levett first examined Plaintiff on February 7, 2003, she diagnosed Plaintiff with post-traumatic stress disorder, borderline personality disorder, and substance abuse, and recommended ten therapy sessions (R. at 166).  The doctor set no specific goals that would reflect Plaintiff's improved functioning, and did not present a discharge plan.  Id.   When Plaintiff was treated by Dr. Levett on February 25, 2003, the doctor simply recorded, "[Plaintiff] had hernia surgery, is recovering, has not been using, but is not sure about relationship with Ed, we agreed she would write about George."   Id.  On May 15, 2003, Dr. Levett treated Plaintiff and noted, "[Plaintiff back from Florida, had been drinking, etc.  Waiting for reports on hepatitis C and liver, etc." (R. at 167).  After Plaintiff's last therapy session with Dr. Levett on September 25, 2003, the doctor noted only, "[Plaintiff], write a letter to George as if you were the one who died and he is alive.  Tell him what you want him to do with his life, what your hopes and wishes are for him" (R. at 168).  Such minimal notations in Plaintiff's record do not reflect any serious concern Dr. Levett may have had that Plaintiff was extremely impaired in her mental functioning and abilities, and thus the notes are inconsistent with Dr. Levett's Medical Source Statement prepared on October

11, 2004.  Additionally, Dr. Levett's opinions are inconsistent with the Medical

Source Statement opinions of State agency psychologist Dr. Brand, who

thoroughly examined Plaintiff on May 4, 2004, and with Dr. Wasfi, who

examined Plaintiff periodically from February 2, 2004, through June 21, 2004

(R. at 188-194, 202-203, 207-208).

Further, it is clear from Dr. Levett's notes that she was aware

Plaintiff had been admitted to the psychiatric unit at Columbia Memorial

Hospital on October 14, 2003, and was transferred to McPike Addiction

treatment Center on October 21, 2003 (R. at 169).  Given this evidence, it

may reasonably be assumed by the Court that Dr. Levett's opinion of

Plaintiff's work-related mental abilities as reflected in her Medical Source

Statement dated October 11, 2004, had been influenced by the knowledge

that Plaintiff had been hospitalized and was in continuing treatment after her

gestural suicide attempt on October 14, 2003.  Thus, the Court finds Dr.

Levett's opinion of Plaintiff's work-related mental abilities, as expressed in her

Medical Source Statement of October 11, 2004, to be immaterial to the final

decision of the Commissioner.

After review of Plaintiff's entire record, including all evidence

submitted to the Appeals Council after the date of the ALJ's decision, the

Court finds the Appeals Council followed its published procedures for

reviewing evidence submitted after the date of the ALJ's decision, evaluated

the evidence for its materiality to the time frame on or before the ALJ's

decision, and properly concluded Plaintiff's new evidence was not of sufficient weight to warrant review of the ALJ's decision.

## Conclusion

13.     After carefully examining the administrative record, the Court finds substantial evidence supports the ALJ's decision in this case, including the objective medical evidence and supported medical opinions.  It is clear to the Court that the ALJ thoroughly examined the record, afforded appropriate weight to all the medical evidence, including Plaintiff's treating physicians, psychologists, and consultative examiners, and afforded Plaintiff's subjective claims of pain and limitations an appropriate weight when rendering his decision that Plaintiff is not disabled.  The Court finds no reversible error, and further finds that substantial evidence supports the ALJ's decision. Accordingly, the Court grants Defendant's Motion for Judgment on the Pleadings and denies Plaintiff's motion seeking the same.

        IT IS HEREBY ORDERED, that Defendant's Motion for Judgment on the Pleadings is GRANTED.

        FURTHER, that Plaintiff's Motion for Judgment on the Pleadings is denied.

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.

Victor E. Bianchini
United States Magistrate Judge

SO ORDERED.

Dated:  August 28, 2008
        Syracuse, New York